## Letchock's Adoption.

*Parent and child—Adoption—Act of May 19, 1887.*

1. Under the Pennsylvania statutes relating to adoption, the essentials are (1) the agreement of the adoptor to perform the duties of parent; (2) the satisfaction of the court that the welfare of the child will be promoted by the adoption: and (3) the consent of the parents, if living.

2. The only case in which the consent of a living parent may be dispensed with is when the parent has neglected or refused to provide for the child for one year or more, proven to the court.

3. A parent who has placed a child with a charitable society which has agreed to support it cannot be said to have neglected or refused to provide for the child.

4. The consent of parents requisite is the present consent to the particular adoption prayed for by the petitioner at the time of presentation of the petition, the parties being presumed to be present in court; a paper signed by the mother of a child consenting that "said child may be legally adopted by such person or persons as may be chosen" by a third party, is not a consent to the particular adoption required by the act.

5. A parent cannot divest himself of his status and rights as a parent, and a contract purporting so to do is void as against public policy; he may transfer to a third party the custody of his child, but such transfer is revocable by the parent at any time.

6. The only circumstances in which the consent to an adoption of a "charitable institution," under the Act of 1887, can take the place of consent of the parents, is where such "charitable institution" shall have supported such child for at least one year, and where there are no parents surviving, or, if surviving, they "shall have neglected or refused to provide for his or her child or children for the period of one year or upwards, proven to the court."

Petition for adoption. C. P. Warren Co., Sept. T., 1921.

*D. U. Arird,* for petitioners.

LINDSEY, P. J., Oct. 24, 1921.—The petition of George Bruce Young and Ivah May Young prays for a decree for the adoption by them of Florence Letchock, a minor child of Margaret Letchock, as one of their heirs.

Adoption is the accepting of the child of another as one's own child and heir. It constitutes between the adoptor and adopted the legal relation of parent and child as well as heir. The relation of parent and child is, of course, a natural one. In our system of social organization the law recognizes this natural relation and annexes to it certain legal attributes or clothes the parties being in this relation with certain rights and duties to each other and to others which they are conceived of as having by reason of sustaining that relation to each other. In other words, it is a status carrying with it certain legal consequences and the rights and duties of the parties exist as such, not by reason of any contract or act of theirs, but solely by reason of this position or relation in which they stand. The extent to which such rights and duties may be affected by contract is, therefore, limited. Adoption is the constituting of this legal relation where it does not exist naturally, but more especially with respect to the inheritance of property. Adoption usually carries with it the right of the custody of the adopted (if a minor), but its primary object is to constitute a succession in the inheritance of property. In general, parents have the duties of protecting, educating and maintaining their children. Correlative to these duties and mainly for the purpose of enabling their fulfillment, parents have the rights of authority over, the custody of and the labor and services of their children. These rights and duties of natural parents are in general and for the same reason extended to adopting parents, and, indeed, to all persons *de facto* standing in the place of parents to minors; but this does not involve the idea of adoption as an heir, and is solely for the benefit of the minor. When, for instance, the natural parents,

through poverty, are unable to fulfill their duties to their children of support, maintenance and education, their rights as parents must give way, so far as is necessary for appropriate provision for the child. In general, however, the suspension of the rights of natural parents is only countenanced by the law so far as it is necessary for the benefit of the child. The family relation being the foundation of our system of social organization, its preservation, so far as possible, is recognized by the law as a principle of public policy, and interference with it in any particular case is limited by actual necessity. Thus, where a natural parent, incapable of performing his or her parental duties to a child, transfers the right of custody to a third person (individual or society), capable of and willing to perform such duties, such transfer is always revocable by the parent, and he may resume the custody if his incapacity be removed, provided only that the welfare of the child will not be prejudiced. Contracts absolutely relinquishing parental rights are void as against public policy. The parent may not divest himself of his duties as parent (or of his status as parent), and for this reason cannot irrevocably transfer his rights. He may lawfully procure the performance of these duties by others if unable himself to perform them, and, so far as is necessary for this purpose, confer his rights upon the foster parent; but this is the extent to which he can go, for the reason that these reciprocal rights and duties are not matters of contract, but integral essentials of the very organization of society. These are principles of our fundamental law which must be kept in mind in considering all questions relating to the status of parent and child.

Adoption, which was recognized in the civil law, was unknown to the common law of England. The law of adoption, therefore, in America in general and in Pennsylvania in particular, is entirely statutory: Ballard v. Ward, 89 Pa. 358.

"The only methods of adoption of children known to the law of Pennsylvania are those prescribed by Act of May 4, 1855, § 7, P. L. 430, as re-enacted by the Act of May 19, 1887, § 1, P. L. 125, and the Act of April 2, 1872, P. L. 31. The former provides for adoption by petition to, and decree of, the Court of Common Pleas, and the latter for adoption by deed duly executed and recorded:" Carroll's Estate, 219 Pa. 440; Keeler's Adoption, 52 Pa. Superior Ct. 516.

To the acts above referred to must now be added that of May 28, 1915, P. L. 580, which, however, merely re-enacts the Act of 1887 in the same language, with an addition to be referred to later.

The proceeding being purely statutory, the statute must be strictly followed in order to give the court jurisdiction: Carroll's Estate, 219 Pa. 440; Keeler's Adoption, 52 Pa. Superior Ct. 516; Luccareni's Adoption, 13 Dist. R. 782.

The Act of 1887 provides: "It shall be lawful for any person desirous of adopting any child as his or her heir, or as one of his or her heirs, to present his or her petition to such court in the county where he or she may be resident, declaring such desire and that he or she will perform all the duties of a parent to such child; and such court, if satisfied that the welfare of such child will be promoted by such adoption, may, with the consent of the parents or surviving parent of such child, or if the father or mother, from drunkenness, profligacy or other cause, shall have neglected or refused to provide for his or her child or children for the period of one year or upwards, proven to the court, with the consent of the non-neglecting father or mother alone, or, if none, of the next friend of such child, or of the guardians or overseers of the poor, or of such charitable institution as shall have supported such child

1 D. & C.

for at least one year, decree that such child shall assume the name of the adopting parent and have all the rights of a child and heir of such adopting parent, and be subject to the duties of such child," etc.

The essentials are, therefore, first, the agreement of the adoptor to perform the duties of parent; second, the satisfaction of the court that the welfare of the child will be promoted by the adoption; and, third, the consent of the parents.

In the case at bar 'we have the first of the above three essentials; as to the second, we have the affidavits of two persons that they are acquainted with the petitioners and that they are persons of respectability and property, and that affiants believe that the welfare of the child will be promoted by the adoption prayed for, which is in accordance with the practice which has become current under the act of assembly. The third essential to give the court jurisdiction, however, the consent of the parents of the child, is entirely lacking.

The effect of an adoption on the natural parents is not entirely clear, but it would seem that, between them and the child, the legal incidents of the relation of parent and child were taken from them and transferred to the adopting parents, so far at least as necessary for the performance of the parental duties assumed by the adoptor. It would seem clear, for instance, that, as to a minor, the right of custody would belong to the adopting parent as against the natural parent, and that the latter was deprived of the same. To give the court jurisdiction to so adjudicate the rights of the natural parent, he must be in court, either actually or constructively, by having appeared voluntarily or had notice served upon him. The act only gives the court jurisdiction to enter a decree "with the consent" of the natural parent, and a decree cannot be made without such consent: Luccareni's Adoption, 13 Dist. R. 782; Sleep's Adoption, 6 Dist. R. 256; Booth v. Van Allen, 7 Phila. 401.

The consent of the parents must be their consent to the particular adoption prayed for, and must be presently given at the time of hearing the petition by the court. "The act contemplates a proceeding in court between parties who are to satisfy the court 'that the welfare of such child will be promoted by such adoption.' Although the proceeding is by petition, the facts stated in it must be supposed to be made as of the date when the petition is presented:" Vendermis v. Gilbert, 10 Pa. Superior Ct. 570.

In that case the father of the child had signed a written consent to the adoption, but died the day before the petition was presented to the court. The Superior Court held that there was no present consent of the parent as required by the act, and, hence, the court below had no jurisdiction to enter the decree.

"The act contemplates a proceeding in court after all parties interested have had due notice, and who are to satisfy the court that the welfare of the child will be promoted by such adoption. The assent of the parties mentioned in the act in giving or waiving a right should affirmatively appear:" Keeler's Adoption 52 Pa. Superior Ct. 516.

The petition in this case avers "that on or about the 26th day of May, A. D. 1920, Margaret Letchock, of Stockton, Pa., being the mother of Florence Letchock, who at that time was at the age of three weeks old, and was born on May 5, 1920, relinquished all the right of said child and committed said child to the care and custody of the Children's Home Society of Pennsylvania, and also consented that the same child be legally adopted by such person or persons as might be chosen by the Children's Home Society of Pennsylvania without further notice, etc." Attached to the petition as "Exhibit A" is a

Letchock's Adoption.

paper purporting to bear the signature of Margaret Letchock and reading as follows: "Know all men by these presents, that Margaret Letchock, of Stockton, Pa., being the mother of Florence Letchock, a child aged three weeks, born May 5, 1920, do hereby relinquish all my right to the said child, and do hereby commit said child to the care and custody of the Children's Home Society of Pennsylvania, and do hereby consent that the said child may be legally adopted by such person or persons as may be chosen by the said Children's Home Society of Pennsylvania without any further notice to the undersigned. Done at Hazelton, Pa., this 26th day of May, 1920." There is also attached a paper headed "Agreement of placement, dated June 8, 1920," and signed by "C. W. Karns, State Superintendent," and by Geo. B. Young and Ivah Mae Young, and a paper headed "Children's Home Society of Pennsylvania," which recites the giving of the "release" by the mother, the placing of the child with the petitioners and giving consent of said society to the adoption prayed for. It seems too clear for any argument that the paper purporting to be signed by Margaret Letchock, if designed to divest her of her status or rights as a parent, is illegal and void for such purpose as against public policy. It is legal and valid as a transfer to the said society of the care and custody of the said child as against all others than the parent, but as such is revocable by the parent at any time, and we are furnished with no evidence, and it is not averred, that it has not been revoked. So far as adoption is concerned, it is a mere expression of willingness to have the child adopted, and is not, and does not purport to be, a consent to the adoption prayed for. So far as waiving by the parent of notice of an adoption is concerned, manifestly the parent cannot waive the jurisdictional requirement of the act of assembly.

Under the act, the only circumstances under which the consent of a "charitable institution" can replace that of the parents is where such "charitable institution" shall have supported such child for at least one year, and where there are no parents surviving, or if both parents "shall have neglected or refused to provide for his or her child or children for the period of one year or upwards, proven to the court."

In order to enable the court to make a decree of adoption where both parents are living, the consent of both must appear, or one or both of them must be shown to have wilfully neglected the child for a period of one year or upward: Com. v. Beears, 1 Berks Co. L. J. 361.

In the case at bar we have no evidence or allegation of any neglect or abandonment by the mother; indeed, the facts show the exact opposite; that she provided for said child by the arrangement she made with the Children's Home Society. If it be argued that to turn it over to the society constituted an abandonment, it is sufficient to say that such an argument is an absolute contradiction of the essential fact. As was said by Judge Allison in Booth v. Van Allen, 7 Phila. 401: "In what proper sense can a mother be charged with having entirely abandoned her child, who has made careful provision for it, secured for it a home and caretaker—one who has agreed to stand in the relation of parent to the infant and perform for it the duties of a mother."

In Keeler's Adoption, 52 Pa. Superior Ct. 516, the mother signed the following paper: "Finding my situation in life wholly unfitted for the proper bringing up and education of my infant child, and considering its future welfare, I hereby give and surrender the same to the future care and keeping of the Sisters of Charity, Seventeenth Street and Woodland Avenue, and I hereby promise and agree not to interfere with it or them in the proper care and education of the said infant, nor with any one to whom the Sisters

1 D. & C.

may hereafter confide the said child for adoption and faithfully carries out my intention of having it brought up in a good Christian family." The court held that this paper was not an abandonment or neglect of the child or consent to its adoption under the Act of 1887, but quite the reverse, and set aside a decree obtained without notice to the mother, and this was sustained by the Superior Court.

This same scheme of this same Children's Home Society was before the Common Pleas of Allegheny County in the case of Sleep's Adoption, 6 Dist. R. 256, and based on practically the same papers, as set forth in the report of that case. In that case the Rev. William Henry Thompson, alleged to be State Superintendent of the Children's Home Society, testified. The opinion in that case by Judge Ewing is so clear and convincing, in our judgment, that we quote from it at some length, as follows:

"It appears from the evidence that the Children's Home Society was incorporated in the State of Illinois, and, according to Mr. Thompson's testimony, he was appointed as agent of this society for Pennsylvania, and he, as such agent, selects advisory boards in different places. Their business is to get children from parents or others in charge of them, and find places for them, where the people to whom they are given in charge will have them legally adopted. Whether the home society in Chicago has any actual home or asylum for children or not does not appear from the testimony. The society here—if there be a society—has no home; simply has its agent to collect money to pay expenses and salaries, and to get children and to find them homes, or to find people who want children and then find the children to take.

"We are of the opinion that such a society, with such a superintendency and association, is not the next friend of a child, nor is it such a 'charitable institution' as is provided for in the Act of May 19, 1887, P. L. 125-6, authorizing them to agree to the adoption of a child; and it has not supported the child for a year, and, therefore, on that account alone, there being no consent of the mother to the adoption, this order allowing the adoption should be revoked.

"It seems from the testimony of Mr. Thompson, the agent, that a part of the plan of the association, or of his work, is in finding a home for a child, and to give the child, in the end, wholly in charge of the parties with whom it is left, under the supervision of himself or other agents of the society, for a probationary period, and then, if satisfactory to him, under an agreement with them that they shall legally adopt the child. And it would seem from his testimony and from the facts in this case that it is considered a part of the humanitarian and philanthropic business of the society, for the alleged good of the child, and especially for the satisfaction of the adopting parents, that the actual parent shall not have intercourse with the child, and, in fact, shall not know where the child is; and a part of the plan shown by the adoption papers in this case is to destroy the identity of the child, so that the mother shall not know where the child is or the child shall not know who the mother is, and the adopting parents shall not know the parents of the child.

"This plan of undertaking to destroy the identity of the child, to hide it from its mother, and hide its mother and parentage from it, is, in our judgment, contrary to sound public policy, directly tending to encourage illegitimacy; is a wrong to the child itself, because those who have the education and training of the child should know its parentage and the peculiarities it inherited. It seems to us that it is so contrary to public policy as to make the alleged contract entered into in this case between the mother and Mr. Thompson void. It ignores her affection for her child, the respect that a child should have for the parent. It is so contrary to all our preconceived notions of a

true public policy, of morality, of humanity, and of Christianity, that it is shocking to us that any persons who believe in the Bible, or who have any regard for parental affection, should adopt such a plan. No doubt there are many cases where it is well, and where it is a good, and where it is a philanthropic, act to procure a good home for a homeless child, or for a child whose parents may be unable to maintain it, and that the bosom of a family is a better place for the rearing of a child into a good citizen than an orphan asylum or other kindred institution, and we do not doubt the good motives of the worthy gentleman in charge of the work of this society in this State, but we do doubt his judgment in the matter, and the work could be done without disregarding the rights of parents and the affections of a mother for a child. To take a child from its parent, and to consign it entirely to the care of another, is a very serious thing for any one to do, whether it be a private citizen or a court. It is to us, when it has to be done, a matter of as serious consideration as the sentencing of a convicted criminal, and it should never be done except on careful consideration and for clearly good reasons."

In this case the title of the society in question is given as "The Children's Home Society of Pennsylvania." The word "incorporated" is placed after the name in the heading of the three papers attached to the petition, but it is nowhere stated or indicated where or how or when it was incorporated or that it is a corporation of any state. The agreement of placement is signed "C. W. Karns, State Superintendent," and the consent to adoption by "Thomas S. Wilcox, President; Thomas Charlesworth, Secretary, and C. W. Karns, State Superintendent," and in neither is there recited any action of a board of directors. Whether the society is organized the same as it was at the time of Sleep's Adoption or not, it does not appear here that it is such a "charitable institution" as is contemplated in the act of assembly.

It does affirmatively appear, however, that the Children's Home Society had not supported the child in question for a year, and for this reason is not such an institution as is authorized by the act to consent to adoptions in certain circumstances. The society received the child from the mother May 26, 1920, and placed it with the petitioners June 8, 1920, since which time it has been supported by the petitioners. If it be argued that the support by petitioners is support by the society because under authority derived from it, by the same reasoning the support is that of the mother because the authority of the society to place the child with petitioners is derived from her.

Finally, there is no consent of the father of the child; it is not alleged that he abandoned it; it is not stated who the father is; he is not mentioned at all in the petition or accompanying papers. It nowhere appears or is alleged that the child is illegitimate. However, even if that were the case, it is not clear that his existence can safely be ignored in all cases. It is implied in Booth v. Van Allen, 7 Phila. 401, that the consent of the father of an illegitimate child is not necessary to an adoption; but that was where the mother consented, and it has been held by Judge Terry in the Common Pleas of Wyoming County, in a carefully considered opinion in Swartwood's Adoption, 19 Dist. R. 819, that "it is evident that the putative father has a right to be heard before his offspring can be surrendered by the mother to a stranger; and this opportunity should be afforded him, not after, but before a decree is made."

The only change made by the Act of 1915 in the Act of 1887 is to dispense with the requirement of the consent of the parents in two other sets of circumstances, which, however, have no relation to the facts in the case at bar, and, hence, need not be considered here.

1 D. & C.

To sum up the discussion. There is no jurisdiction in the court to decree the adoption prayed for, because:

*(a)* There is no consent of either father or mother of the child to the adoption prayed for.

*(b)* There is no explanation whatever of the absence of the consent of the father; no allegation that he abandoned the child, and no allegation that the child is not legitimate.

*(c)* The paper purporting to have been signed by the mother of the child May 26, 1920, is not a consent to the adoption prayed for, and can in no way abridge the requirement of the act of assembly for such consent in order to give the court jurisdiction to decree an adoption.

*(d)* It affirmatively appears that the mother did not abandon the child, and, therefore, the contingency provided for in the act, in which a "charitable institution" might consent in place of the parents, is not present in this case.

*(e)* The Children's Home Society of Pennsylvania is not shown to be a "charitable institution" within the meaning of the act of assembly authorizing such institutions to consent to adoptions in certain contingencies.

*(f)* The Children's Home Society of Pennsylvania did not support the child in this case for a year, as affirmatively appears, and, therefore, is in that respect not within the charitable institution authorized by the act of assembly to consent to adoptions in certain contingencies.

And now, Oct. 24, 1921, the petition is dismissed, at the costs of the petitioners.

From W. S. Clark, Warren, Pa.

NOTE.—Syllabus by the court.